UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KIM R. TIHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 1979 JMB |
| | ) | |
| CITY OF BELLEFONTAINE NEIGHBORS, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motion for summary judgment. Plaintiff has filed a response in opposition and the issues are fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Plaintiff Kim Tihen was employed by the defendant City of Bellefontaine Neighbors police department from January 20, 2013, through September 2, 2016. She worked as a patrol officer until the summer of 2014, when she became a detective. She alleges that defendant Mayor Robert J. Doerr subjected her to gender-based discrimination, a hostile work environment, and retaliation. In addition, she alleges that defendant Chief of Police Jeremy Ihler failed to address defendant Doerr's conduct and that defendant City Clerk Deni Donovan failed to properly investigate after plaintiff filed a formal complaint. She also claims that the defendants conspired to violate her constitutional rights and established policies and procedures to condone discriminatory conduct. Plaintiff asserts claims for gender discrimination (Count I) and retaliation (Count II) in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et*

*seq.*, and asserts claims under 42 U.S.C. § 1983 for conspiracy to violate her civil rights (Count IV), and Monell liability for failure to train, instruct, supervise, control and/or discipline (Count V). Plaintiff concedes that her claim asserted in Count III should be dismissed because 42 U.S.C. § 1981 does not provide a remedy for gender-based claims.

## I.     Factual Background[1]

Plaintiff joined the Bellefontaine Neighbors police department in January 2013. Def. SUMF at ¶ 1 [Doc. # 32]. In the summer of 2014, she became the city's second detective and joined the Major Case Squad. Pl. Dep. at 31-32, 64 [Doc. # 32-1]. Throughout her employment with Bellefontaine Neighbors, plaintiff showed consistent progress in her performance and received high marks on annual employee evaluations. Def. SUMF at ¶ 3; Perf. Evals. 2013 through 2016 [Doc. # 32-3].

Multiple witnesses testified that defendant Doerr often bullied subordinates, berated employees of the police department, and was condescending and antagonistic. Ihler Dep. at 86-88 [Doc. # 32-2] (testifying that he found the mayor's comments unprofessional at minimum); Applegate Dep. at 15 [Doc. # 32-4] (testifying that defendant Doerr "screams and yells" at others and tries to use his position to intimidate); id. at 56 (describing mayor as narcissistic, overbearing, and acting from emotion); Sanders Dep. at 23-24 [Doc. # 32-14] (describing defendant Doerr as abrasive, loud, inappropriate, and bullying). Defendant Doerr made repeated jokes about a male police officer's weight, which led to a formal complaint and investigation.

---

[1] In support of their motion for summary judgment, defendants submitted a statement of uncontroverted material facts, to which plaintiff has filed a response. See E.D. Mo. L.R. 4.01(E) (party moving for summary judgment shall file a statement of uncontroverted facts with citations to the record; party opposing summary judgment shall file statement of disputed facts). Plaintiff also filed a statement of "additional facts in dispute, uncontroverted by defendants or admitted by defendants." Defendants argue that the rules do not provide for such a statement and filed a motion to strike, which is fully briefed. Here, the parties are in general agreement about the critical events, differing rather in how they characterize those events. Because the Court has reviewed all of the evidence and draws all inferences in favor of the nonmovant, there is no need to address the parties' arguments regarding the format in which they present the facts for consideration. Defendants' motion to strike will be denied.

Ihler Dep. at 56-57 (testifying mayor made fat jokes about officer in front of other officers); Doerr Dep. at 120-21 [Doc. # 32-5] (testifying he made "locker room fat jokes" in front of other people); Donovan Dep. at 37-42 [Doc. # 32-8] (testifying that she received complaint from officer and retained investigator). Defendant Doerr also had "old world traditional" views regarding gender-based roles. Ihler Dep. at 25-26 (testifying that the mayor referred to women as "the girls" and men as "the boys").

Plaintiff had six encounters with defendant Doerr which she claims were motivated by impermissible gender bias or created a hostile environment. The first occurred on Administrative Professionals Day in April 2015, when defendant Doerr entered the detectives bureau and handed plaintiff a rose. Pl. Dep. at 57 (testifying that Doerr said, "Here. Happy Secretary's Day."). Some of plaintiff's colleagues thought the mayor's conduct was disrespectful. Sanders Dep. at 20-21 [Doc. # 32-14] (testifying that Doerr patted plaintiff on back and displayed disrespect to a commissioned police officer); Applegate Dep. at 63-64 [Doc. # 32-4] (testifying plaintiff was embarrassed by the incident); Ihler Dep. at 102-04 [Doc. # 32-3] (describing Applegate as "pretty upset" by the incident). Defendant Doerr had no recollection of the incident, but acknowledged that it was possible that he gave plaintiff a rose. Doerr Dep. at 138 [Doc. # 32-5].

In June or July 2015, plaintiff and Sergeant Peggy Vassallo were responsible for providing security for night court. Pl. Dep. at 51. It was the usual practice for the officers to admit the public at 5:30. Id. at 52. On the occasion at issue, defendant Doerr came into the police department before 5:30 and began yelling that he wanted the doors opened immediately. Id. at 53-54. Lieutenant Shawn Applegate heard the mayor "screaming and yelling" and went to intervene. Applegate Dep. at 58-59. Applegate testified that he was embarrassed because the

mayor screamed at him in front of his subordinates and the people waiting to enter the court. He later explained to defendant Doerr that the doors could not be opened before staff and security measures were in place. He told the mayor that "his behavior was inappropriate," and that he was not to speak to Applegate or any of his subordinates in that way. Id. at 59-60. Plaintiff testified that no one had ever yelled at her in the way that defendant Doerr did on that occasion, but she had heard him use a similar tone with other women, including Sergeant Vassallo and women on the administrative staff. Pl. Dep. at 55-56.

Sergeant Vassallo was the police department's community relations officer. See Ihler Dep. at 28-29 (community relations officers prepare crime reports, do community outreach, take on specialized assignments based on community needs, and act as liaison between city and community); Doerr Dep. at 32 (community relations officer conduct school drug programs, address relations with the business community, and do activities that promote relationships between police department and citizens). In August 2015, Sergeant Vassallo was struck and killed by an automobile. Pl. Dep. at 90. Defendant Doerr wanted plaintiff to fill the role of community relations officer and testified that he "offered her the position [because] she would be replacing a female officer, and at the time, I was emotionally connected to that female officer who had just been killed in an automobile accident, and I felt that a female officer was best suited for that position." Doerr Dep. at 31. According to plaintiff, defendant Doerr told her he wanted her for the position because Sergeant Vassallo was "soft-spoken, petite, female, and females are able to talk to people better than males." Pl. Dep. at 38; Ihler Dep. at 32-33 (mayor wanted clone of Sergeant Vassallo, who was petite and female). Plaintiff testified that she was

not interested in the role because she liked doing detective work.[2]  Pl. Dep. at 40.  Chief Ihler

also asked her if she wanted the position but dropped the topic when she said she was not

interested.  Id. at 40-41 (testifying that Ihler did not pressure her to take the role).  By contrast,

she testified, Lieutenant Willis repeatedly told her she should take the position because "women

are better at talking to people."  Id. at 42.  Plaintiff found his comments offensive and

complained to Lieutenant Applegate, who told Willis "to stop bothering" plaintiff about it.  Id. at

43-44.  Ultimately, the position was taken by Officer David Owens.  Id. at 42.

     As the department's only two detectives, plaintiff and Shawn Applegate were on call

quite often.  Ihler Dep. at 80 (testifying that investigation bureau is very small and the detectives

"call out great volume").  The department had two take-home vehicles for its detectives, one of

which was assigned to Lieutenant Applegate.  Applegate Dep. at 66.  According to defendant

Ihler, a take-home car was a "necessity" for the detectives.  Ihler Dep. at 80.  Plaintiff asked

defendant Ihler to assign the other car to her.  Pl. Dep. at 60.  Ihler asked the mayor about getting

a car for plaintiff but never received an answer.  Ihler Dep. at 79.  Defendant Doerr testified that

he was never approached about giving plaintiff a take-home car.  Doerr Dep. at 161.  The male

detective who took plaintiff's place was assigned a car.  Pl. Dep. at 61 (replacement was

assigned car in two weeks); Ihler Dep. at 80 (plaintiff's replacement got take-home car); Doerr

Dep. at 161 (Board of Alderman approved replacement's car).

     On May 1, 2016, Shawn Applegate completed an annual evaluation of plaintiff's

performance.  Perf. Eval. [Doc. # 32-3 at 8-10].  He assessed plaintiff's performance as above

average or average in each of ten categories and assigned her an overall rating of excellent.  As

relevant here, plaintiff's "bearing and appearance" were "very good" and she always left "a good

---

[2] Plaintiff also testified that the mayor used to treat Sergeant Vassallo "like she was his personal assistant."  Id. at 46-47 (plaintiff observed mayor come into the detective bureau and demand that Vassallo stop whatever she was doing to take care of tasks for him, "no matter how trivial.")

impression." Id. at 8. Indeed, she "surpass[ed] expectations as it pertain[ed] to her overall bearing and her overall appearance [was] commensurate with her assigned position." Id. at 10. Defendant Ihler also rated her performance as excellent and, on May 3, 2016, recommended her for a merit raise. On June 2, 2016, defendant Doerr signed the document indicating his approval. He also wrote, however, "Her appearance at times is not what I expect. Improvement is needed. Very seldom smiles, yet does good work." Other evidence in the record suggests that defendant Doerr's comment was in stark contrast with how plaintiff was viewed by her colleagues. See Ihler Dep. at 90-91 (testifying that he never received complaints about plaintiff's appearance or observed her looking unkempt); Applegate Dep. at 84-85 (testifying that no one complained about plaintiff's appearance and characterizing defendant Doerr's comment as highly inappropriate and offensive).

Plaintiff first became aware of defendant Doerr's comment in July 2016 when she requested a copy of the evaluation for her records. Pl. Dep. at 65; see also id. at 67 (plaintiff testified she believed she received copies of prior evaluations without having to request). According to plaintiff, defendant Doerr's comment could be a "career ender" and she was "shocked, very angry, and offended, very upset with the mayor [and] with Chief Ihler for hiding it from [her]." Id. at 70, 68. Plaintiff immediately confronted defendant Ihler, who told her he was unaware of defendant Doerr's comments. Id. at 77. When plaintiff said that she wanted the comments removed, defendant Ihler told her there was nothing he could do about it. She testified that she did not believe him because he had previously intervened to have the mayor's negative comments removed from a male officer's evaluation. Id. at 78, 69; see also Doerr Dep. at 154-55 (testifying he removed comments from evaluation of employee who was target of fat jokes). Defendant Ihler did agree, however, to arrange a meeting for plaintiff with defendant

Doerr.  Ihler Dep. at 79.  He later told plaintiff that he had spoken with Doerr who asked that she

contact him directly.  Id.; see also id. at 122-23 (describing discussion with plaintiff in which

they reviewed options).  Plaintiff emailed defendant Doerr a request for a meeting and asked that

Lieutenant Applegate be allowed to attend as well.  Pl. Dep. at 79-80.  Defendant Doerr agreed

to a meeting but told her that Applegate was not welcome to attend.  Id.; Doerr Dep. at 143-44.

On August 2, 2016, plaintiff met with defendant Doerr in his office.  Plaintiff testified

that defendant Doerr "looked angry" with her and directed her to sit down.  Pl. Dep. at 82-84.

She told him she wanted an explanation for the comments he made on her evaluation.  Id. at 84.

He responded that she was very visible to the public in her role as a detective and that he did not

see her smiling.  Id. at 85.  When plaintiff countered that they rarely saw each other because they

worked in separate parts of the building, defendant Doerr told her that he had been watching her.

Id. at 85, 129-30.  Plaintiff testified that this statement alarmed her because she had been told

that the mayor once requested video surveillance of an alderwoman with whom he had

disagreements.  Id. at 129-31.  Defendant Doerr also told plaintiff that she did not say hello to

him and appeared to be avoiding her, which she denied.  Id. at 86.  When plaintiff asked him

about his criticism of her appearance, he responded, "You don't brush your hair and it is in

disarray."  She was taken aback and asked if it was in disarray at the moment, and he answered,

"Yes, the left side."[3]  Pl. Harassment Memo [Doc. # 32-6 at 2].

Plaintiff testified that she went into the meeting assuming that there would not be any

difficulty in getting defendant Doerr to remove the comments.  Instead, she testified, he seemed

"kind of proud of himself" — he raised his voice and was condescending and arrogant.  Pl. Dep.

at 86-87, 93.  She pointed out to him that his comments on her evaluation violated provisions of

_____

[3] When she left the meeting, plaintiff asked someone to take a photograph to document what her hair looked like.
Pl. Dep. at 94-95.

the city's personnel manual and the police department's general orders.  Pl. Harassment Memo at 2-3.  He told her that he was the mayor and didn't have to follow the rules.  Pl. Dep. at 93.  He leaned in toward her with a very intense focus on her that she described as intimidating.  Id. at 94, 139-40.  The meeting ended with her request that he remove the comments, which he refused.  When she said that she would take further steps, defendant Doerr said, "Go ahead. You're leaving in a month anyway."[4]  Id. at 94-95; Doerr Dep. at 148.

Following the meeting, plaintiff submitted a formal complaint to Lieutenant Applegate as her supervisor.  [Doc. # 32-6].  Plaintiff asserted that defendant Doerr exceeded his authority by commenting on an employee's performance and violated both the City's anti-harassment policy and provisions of the police departments procedures for completing performance evaluations. Plaintiff also stated that defendant Doerr was "holding [her] to [an] unknown, unattainable standard, different than that of my male counterparts."  Id. at 4-5.  She further stated that "less than a year ago, Mayor Doerr was very pleased with me . . . and asked me specifically to replace Sgt. Vassallo as Community Relations Officer.  He stated that he wanted a female in that position and believed that I would excel."  Id. at 5.  She stated that defendant Doerr was "displeased" when he "was forced" to fill the position with a male officer.  She concluded by stating, "I believe this to be a factor in his sudden, unexpected displeasure with me and his inappropriately critical remarks."  Id.

Applegate forwarded plaintiff's complaint to the City Clerk, defendant Deni Donovan, as required by the city's personnel rules and regulations.  Handbook at 31 [Doc. # 32-7 at 5] (detailing complaint procedures).  Ms. Donovan was on vacation and did not receive the

---

[4] Plaintiff testified that the work environment got worse after Sergeant Vassallo died.  Id. at 88.  She had a lot of responsibilities added on and she thought defendant Doerr was not "happy with" her.  Between her duties for the Major Case Squad and increased homicides, she was "called on all the time," and she was concerned that she was placing herself and the city at risk of liability.  She "begged" defendant Ihler for help, but he repeatedly told her that defendant Doerr would not approve it.  Id. at 88-89.  In early 2016, she "half-heartedly" applied for "a couple of jobs."  Id. at 91.

complaint until August 9, 2016.  <u>See</u> Def. SUMF at ¶ 21; Donovan Dep. at 53 [Doc. # 32-8]; <u>see also</u> Acknowledgment [Doc. # 32-9].  She contacted the city's human resources counsel, Chris Hesse.  Donovan Dep. at 54, 29-30.  She took no other action.  Donovan Dep. at 50.

On August 19, 2016, plaintiff resigned, effective September 2, 2016.  [Doc. # 32-10].  Plaintiff testified that no one gave her any information regarding investigation of her complaint and she was unhappy with the lack of response.  Pl. Dep. at 108.  She testified that defendant Ihler asked her on behalf of Mr. Hesse whether she would drop the complaint if defendant Doerr's comments were removed from her evaluation.  Pl. Dep. at 106, 108; <u>see also</u> Ihler Dep at 129-31 (testifying that he recalls hearing of the offer).  Plaintiff testified that she thought that Hesse's request was an effort to coerce her into dropping the complaint without an investigation.  Pl. Dep. at 108.  She acknowledged that she never asked any of the defendants about the status of her complaint before she resigned.  <u>Id.</u> at 109-10.  She testified that, in addition to her complaints regarding defendant Doerr's conduct, she felt betrayed by defendant Ihler's failure to act on her behalf and, more generally, on behalf of the police department.  <u>Id.</u> at 110-13.

Additional facts will be included in the discussion as necessary.

## II.     Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." <u>Anderson</u>, 477 U.S. at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. <u>Id.</u> at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. <u>Id.</u> at 248. The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. <u>Id.</u> at 255.

Plaintiff argues that summary judgment "should seldom be used in employment-discrimination cases," citing <u>Johnson v. Minnesota Historical Soc'y</u>, 931 F.2d 1239, 1244 (8th Cir. 1991). [Doc. # 39 at 12]. The Eighth Circuit subsequently clarified that "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1043 (8th Cir. 2011).

III.    **Discussion**

A.      **Count I — Gender-Based Discrimination and Hostile Environment**

In Count I, plaintiff asserts that defendants subjected her to gender-based discrimination and a hostile work environment. As an initial matter, plaintiff's claims against defendants Doerr, Ihler, and Donovan in their individual capacities must be dismissed because individual employees cannot be personally liable under Title VII. <u>McCullough v. Univ. of Arkansas for Med. Scis.</u>, 559 F.3d 855, 860 n.2 (8th Cir. 2009) (citing <u>Bonomolo-Hagen v. Clay Cent.-Everly Cmty. Sch. Dist.</u>, 121 F.3d 446, 447 (8th Cir.1997) (per curiam)).

Title VII makes it unlawful to discriminate on the basis of sex with regard to the "terms, conditions, or privileges of employment" and prohibits an employer from depriving "any individual of employment opportunities or otherwise adversely affect[ing] his status as an employee" on the basis of sex. 42 U.S.C. § 2000e–2(a)(2). Plaintiffs alleging discrimination in violation of Title VII "must show either direct evidence of discrimination or evidence that is sufficient to create an inference of discrimination under the McDonnell Douglas burden-shifting framework." Fatemi v. White, 775 F.3d 1022, 1040 (8th Cir. 2015) (quoting Butler v. Crittenden Cty., Ark., 708 F.3d 1044, 1050 (8th Cir. 2013)). Although plaintiff asserts that she has presented direct evidence of discrimination, she has chosen to proceed under the McDonnell Douglas framework. See Memo [Doc. # 39 at 12]. Thus, plaintiff must first establish a prima facie case of gender discrimination. Fatemi, 775 F.3d at 1040. If she succeeds in establishing her prima facie case, the defendants must then "provide a non-discriminatory, legitimate justification for their conduct, which rebuts the employee's prima facie case." Id. (quoting Twiggs v. Selig, 679 F.3d 990, 993 (8th Cir. 2012) (alterations, internal quotations, and citations omitted). "Once the defendants provide this reason, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." Id. (alterations omitted). Defendants contend that plaintiff has failed to establish her prima facie case.

## 1. Discrimination

In order to establish a prima facie case of gender-based discrimination, plaintiff must prove "that she (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful sex . . . discrimination." Butler, 708 F.3d at 1050. "The required prima facie showing is a flexible

evidentiary standard, and a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011) (internal quotation and citation omitted).

Defendants argue that plaintiff cannot satisfy the third element of her prima facie case because she did not suffer an adverse employment action. "An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013). "However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." Id.; see also Wedow v. City of Kansas City, Mo., 442 F.3d 661, 671 (8th Cir. 2006) ("Mere inconvenience without any decrease in title, salary, or benefits" or that results only in minor changes in working conditions does not meet this standard.") (citation omitted).

a.    Comments on 2016 Evaluation

Plaintiff claims that defendant Doerr's comments on her evaluation constitute an adverse employment action. Defendants disagree, arguing that the comments themselves had no impact on plaintiff's evaluation. As noted above, plaintiff's immediate supervisor and the chief of police both rated her performance as excellent — the highest rating an officer could receive. Applegate specifically noted that plaintiff "surpasses expectations as it pertains to her overall bearing and her overall appearance is commensurate with her assigned position." And, on the

strength of the 2016 evaluation, defendant Ihler recommended plaintiff for a merit raise.[5]

Indeed, despite the apparent disfavor with which he viewed her appearance, defendant Doerr

praised plaintiff's work and approved both the evaluation and the raise.  The Court finds that no

reasonable fact finder could conclude that the mayor's comments converted this positive

evaluation into a poor one.

      Even if the 2016 evaluation can fairly be characterized as negative or poor, it still does

not constitute an adverse employment action for the purposes of plaintiff's Title VII claims.  "A

poor performance rating does not in itself constitute an adverse employment action because it has

no tangible effect upon the recipient's employment."  <u>Spears v. Missouri Dep't of Corr. &</u>

<u>Human Res.</u>, 210 F.3d 850, 854 (8th Cir. 2000) (citing <u>Cossette v. Minnesota Power & Light</u>,

188 F.3d 964, 972 (8th Cir. 1999) and <u>Montandon v. Farmland Indus., Inc.</u>, 116 F.3d 355, 359

(8th Cir. 1997)).  "An unfavorable evaluation is actionable only where the employer

subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the

recipient's employment."  <u>Id.</u> (citing <u>Enowmbitang v. Seagate Tech., Inc.</u>, 148 F.3d 970, 973-74

(8th Cir. 1998); and <u>Montandon</u>, 116 F.3d at 359).  <u>See also</u> <u>Hughes v. Stottlemyre</u>, 454 F.3d

791, 796-97 (8th Cir. 2006) (rejecting argument that poor performance evaluation constituted an

adverse employment action where plaintiff failed to present evidence "tending to show the

evaluation was relied upon to effect any material change in the terms or conditions of his

employment.").  As noted, plaintiff was approved to receive a raise despite the negative

comments.

---

[5] In opposition to summary judgment, plaintiff characterizes this raise as "automatic."  [Doc. # 39 at 17].  There is no citation to any evidence in the record to support this characterization, and defendant Doerr testified that the merit raises were not automatic.  [Doc. # 32-5 at 46].

Plaintiff contends that defendant Doerr's comments could have a negative effect on her future career prospects. As she acknowledged, however, she believes that she would receive a favorable recommendation from Bellefontaine Neighbors, "so long as the mayor isn't writing it." Pl. Dep. at 121. Indeed, plaintiff testified that the biggest barrier to employment in her chosen field is the publicity created by this lawsuit itself. Id. at 122 (testifying that she had not anticipated the coverage the lawsuit received and stating, "No one wants to hire somebody that's suing the place that they worked at."). The Court concludes that defendant Doerr's comments[6] on plaintiff's 2016 evaluation do not constitute an adverse employment action for the purposes of her discrimination claim.

b.      Take-home car

Plaintiff requested a take-home vehicle when she became a detective to ease the burden of being on-call.[7] Her supervisor Shawn Applegate had one of the two take-home cars and thought plaintiff should have the other. Defendant Ihler testified that a car was a necessity for the detectives. Nonetheless, plaintiff never received authorization for a take-home car and the male detective who filled plaintiff's position was approved for a take-home car within a short time of taking the position.

The record is thin with respect to the consequences of not providing a detective with a take-home car, but plaintiff has presented evidence that the police personnel believed the car was

---

[6] The Court's finding on this issue is not to suggest that defendant Doerr's comments were beyond reproach. As plaintiff stated in her formal complaint, the mayor seems to have been "displeased" when she decided not to take the community relations job. [Doc. # 32-6 at 5]. The inference that he acted from an unwarranted or perhaps petty motive, without more, is not sufficient to support a claim that he was motivated by gender bias. Indeed, the record shows that the mayor made similarly inappropriate comments on the evaluation of a male officer whose weight failed to meet his subjective standards.

[7] Plaintiff asserts in her statement of additional facts that she requested the car after she declined to take the community relations officer position, which occurred after Peggy Vassallo's death in August 2015. Pl. SMF at ¶ 84 [Doc. # 37]; Def. SUMF at ¶ 8. This is inconsistent with her testimony that she made the request shortly after becoming a detective, which occurred in the summer of 2014. Pl. Dep at 45.

a significant benefit rather than a mere convenience.  See Wedow, 442 F.3d at 671 ("We cannot

say as a matter of law that being required to work as a firefighter with inadequate protective

clothing and inadequate restroom and shower facilities is a mere inconvenience.").   In asserting

that the denial of a take-home car is not an adverse action, defendants argue only that plaintiff

did not ask defendant Doerr directly for the car or submit a written request for a vehicle.  [Doc. #

41 at 4].  First, this argument is not responsive to whether plaintiff sustained a tangible

deprivation of a benefit that produced a material change in her working conditions.   Second,

there is no evidence in the record that plaintiff was required to take either step in order to receive

a car.  Finally, the fact that male detectives were assigned a take-home car supports an inference

of unlawful sex discrimination, as required to satisfy the fourth element of plaintiff's prima facie

case.  The Court finds that plaintiff has established her prima facie case of gender discrimination

with respect to the failure to provide her with a take-home car.  Defendants do not assert that

they had a legitimate nondiscriminatory reason for this adverse action and thus are not entitled to

summary judgment on this claim.  See Fatemi, 755 F.3d at 1040 (defendants must rebut

employee's prima facie case with "non-discriminatory, legitimate justification for their

conduct").

### c.      The Remaining Incidents

Plaintiff cannot establish that she suffered an adverse employment action arising from

defendant Doerr's other challenged conduct — offering her a rose, asking her to take the

community relations position, and the 2015 yelling incident — because they did not result in a

material change in the terms or conditions of her employment.  In addition, she cannot establish

that the 2015 yelling incident was motivated by gender because the evidence shows that

defendant Doerr yelled at both male and female police officers, with Lieutenant Applegate bearing the brunt of a one-on-one exchange with the mayor.

Plaintiff suggests that actionable harm arises from the cumulative effect of the mayor's conduct, relying on Phillips v. Collings, 256 F.3d 843 (8th Cir. 2001), and Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). In both cases, the Eighth Circuit found an adverse employment action even though the plaintiffs were not fired and did not suffer a change in pay or benefits. Higgins v. Gonzales, 481 F.3d 578, 588 (8th Cir. 2007), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011). The plaintiff in Kim was given reduced job duties, was excluded from meetings, and was placed under constant surveillance. Kim, 123 F.3d at 1060. In Phillips, the plaintiff's supervisor drafted a fifty-three page evaluation "that castigated every aspect of [his] work performance, imposed remedial training [and] corrective action plans, and was part of [his] personnel file." Phillips, 256 F.3d at 848. The facts in this case "do not approach the particularly extreme set of facts and systemic bad treatment presented in Kim and Phillips." Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 805 (8th Cir. 2013) (internal quotations omitted) (rejecting claim that longer personnel file, without other consequences, constituted materially adverse employment actions); see also Higgins, 481 F.3d 584-89 (series of actions including loss of primary job duty; denial of supervision, mentoring, and training; creation of shadow file and "whisper campaign" about performance; formal complaints; termination recommendation; and job transfer did not individually or cumulatively amount to adverse employment action).

Defendants' motion for summary judgment will be granted with respect to plaintiff's disparate treatment claims with the exception of her claim that she was improperly denied a take-home vehicle.

## 2.    Hostile Environment

Plaintiff also alleges in Count I that she was subjected to a hostile environment based on her gender.  To establish a prima facie case, plaintiff must prove that (1) she is a member of a protected group; (2) she was the subject of unwelcome sexual harassment; (3) a causal nexus existed between the harassment and protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take prompt and effective remedial action.  Hales v. Casey's Mktg. Co., 886 F.3d 730, 735 (8th Cir. 2018) (citing Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999)). The fourth element includes both subjective and objective components.  Id. (citing Blomker v. Jewell, 831 F.3d 1051, 1056 (8th Cir. 2016)).  In order to show that the harassment affected a term or condition of employment, "the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment."  Id. (quoting Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111 (8th Cir. 1997)).

"The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment."  Blomker, 831 F.3d at 1056-57 (quoting Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005)).  Thus,

> [t]he standards for a hostile environment are demanding, and "conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment."  When evaluating a hostile environment, we look at the totality of the circumstances, "including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance."

Id. (citations omitted).  "A plaintiff must establish that discriminatory intimidation, ridicule, and insult permeated the workplace."  Wilkie v. Dep't of Health & Human Servs., 638 F.3d 944, 953

(8th Cir. 2011). "Title VII does not, however, create a cause of action for all unpleasant or abusive behavior in the workplace." Eich v. Bd. of Regents for Cent. Missouri State Univ., 350 F.3d 752, 759 (8th Cir. 2003) (quoting Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997)) (internal quotations omitted).

To review, defendant Doerr (1) gave plaintiff a rose and said "Happy Secretary's Day;" (2) yelled at Applegate, Vassallo, and plaintiff to open the doors to court; (3) expressed a belief that the community relations officer should be a small, petite, soft-spoken woman; (4) refused or failed to provide plaintiff with a take-home vehicle; (5) made unwarranted comments on her appearance on her 2016 evaluation; and (6) acted in an intimidating fashion during plaintiff's July 2016 meeting with him.

The Eighth Circuit has consistently required much more severe and pervasive conduct than that alleged here. McMiller v. Metro, 738 F.3d 185, 188 (8th Cir. 2013) (affirming summary judgment in favor of employer on sexual harassment claim where supervisor kissed plaintiff's face on two occasions, placed his arms around her or attempted to do so three times, and requested that she remove an ingrown hair from an area near his chin); Anderson v. Family Dollar Stores of Ark., Inc., 579 F.3d 858, 862-64 (8th Cir. 2009) (affirming summary judgment in favor of employer when supervisor regularly rubbed employee's shoulders, called her "baby doll," implied that the employee would advance faster if she got along with him, and called her to tell her she should be in bed with him); Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 843-44, 846 (8th Cir. 2006) (affirming summary judgment in favor of an employer where, over 20 years, coworker made a myriad of sexual comments to and about the plaintiff, stuck a shovel between plaintiff's legs and rubbed him with it, authored a belittling and sexually suggestive poem about plaintiff, showed plaintiff a Playboy magazine and a pornographic movie,

and put snakes and mice in plaintiff's lunch box); LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1100-03 (8th Cir. 2005) (holding that plaintiff had not established actionable harassment where harasser asked him to watch pornographic movies and to masturbate together, suggested that plaintiff would advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh); Ottman v. City of Independence, 341 F.3d 751, 755, 760 (8th Cir. 2003) (reversing the denial of a summary judgment and "conclud[ing] the district court erred in finding a triable issue for the jury" where a coworker made sexist and belittling comments to, about, and around plaintiff "on a weekly, if not daily, basis").

Plaintiff argues that defendant Doerr was generally disrespectful of the members of the police department. [Doc. # 39 at 19] (plaintiff argues that she was exposed to "abhorrent workplace conditions wherein Mayor Doerr engaged in repetitive discriminatory intimidation — both physically and psychologically [and] ridiculed and insulted anyone he chose to."). The harassment of other employees may be relevant to a hostile work environment claim. Mahler v. First Dakota Title Ltd. P'ship, No. 16-CV-4127-LRR, 2018 WL 1096838, at *7 (N.D. Iowa Feb. 28, 2018) (citing Stewart v. Rise, Inc., 791 F.3d 849, 859 (8th Cir. 2015) ("[W]e have held evidence that a decisionmaker tolerated a hostile environment can be relevant to the question of whether that decisionmaker later terminated an employee due to a discriminatory motive."); Watson v. CEVA Logistics U.S., Inc., 619 F.3d 936, 943 (8th Cir. 2010) (noting "that slurs and other incidents evidencing racial animus were directed at co-workers in the same protected group" and concluding that "[t]his is relevant in assessing the existence of a hostile work environment, particularly where[,] as here, the plaintiffs were aware of this conduct")).

Even with the evidence that the mayor's conduct created an unpleasant working environment, however, plaintiff still has the burden of establishing that she herself was subject to unwelcome harassment.  Id. (citing Blake v. MJ Optical, Inc., 870 F.3d 820, 827 (8th Cir. 2017)).  Plaintiff has not met that burden here because the mayor was disrespectful to both male and female employees of the police department and often for reasons having little to do with gender.  See Sanders Dep. at 28 (testifying he was not aware of mayor having different standard for male and female employees); see also Ihler Dep. at 25 (mayor said in a public forum that police department employees were lazy); Sanders Dep. at 24 (mayor routinely enters roll call room and "lay[s] into" officers he finds there).  The Court finds that defendants are entitled to summary judgment on plaintiff's hostile environment claim asserted in Count I.

### B.      Count II — Title VII Retaliation

Title VII prohibits employers from retaliating against employees who oppose unlawful discrimination.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, plaintiff "must prove (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) the materially adverse action was causally connected to her protected activity.  Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013).  "'Protected activity' in this context includes opposition to employment practices prohibited under Title VII; however, a plaintiff employee need not establish that the conduct he opposed was in fact prohibited under Title VII; rather he need only demonstrate that he had a 'good faith, reasonable belief that the underlying challenged conduct violated [Title VII].'"  Bakhtiari v. Lutz, 507 F.3d 1132, 1136-37 (8th Cir. 2007) (quoting Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000)).

Plaintiff's formal complaint filed on August 2, 2016, clearly constituted protected activity for the purpose of her retaliation claim. She alleges that, in response to her formal complaint, defendant Doerr "engaged in a series of actions designed to punish [her] for registering her complaint regarding his comments and behavior with the City Clerk." Complaint [Doc. # 1 at ¶ 35]. She further alleges that the defendants "engaged in acts of retaliation" after she decided "to complain about Mayor Doerr's behavior and the City Clerk's subsequent response." Id. at ¶ 37. Plaintiff has not supported these allegations with any evidence of retaliatory actions that occurred after she filed her complaint. In her opposition to summary judgment, plaintiff attempts to expand the scope of her protected activity by claiming that she complained to her supervisors after the mayor gave her a rose, asked her to apply for the community relations position, and yelled at the police officers about opening court. [Doc. # 39 at 24]. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes" protected activity. Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271, 276 (2009) (internal quotations and citations omitted). At deposition, however, plaintiff testified that she did not complain after the mayor gave her a rose or yelled about the opening of court. Pl. Dep. at 59-60 (testifying that she did not complain after receiving rose or the mayor's yelling). She also testified that she complained about Lieutenant Willis trying to pressure her to take the community relations position, not the mayor. Id. at 43-44. And, when she complained to Lieutenant Applegate, he told Willis to stop. There is no evidence that plaintiff suffered any retaliation after this incident. Thus, the only potentially actionable protected activity consists of the August 2, 2016 formal complaint.[8]

---

[8] In her formal complaint, plaintiff suggested that defendant Doerr's inappropriate comments on her evaluation were in response to his displeasure at her refusal to accept the CRO position, forcing him to accept a male officer in the

Plaintiff asserts that she was constructively discharged.[9] See Charge of Discrimination [Doc. # 1-2] (alleging that Mayor Doerr's comments on her evaluation constituted sex discrimination and that his "behavior continued until such time as [she] felt compelled to resign."). The evidence establishes that plaintiff resigned shortly after filing her formal complaint. Generally, a plaintiff's voluntary resignation is not considered an adverse employment action. Fenney v. Dakota, Minn. & E. R. Co., 327 F.3d 707, 717 (8th Cir. 2003). But, an employee can satisfy the adverse action requirement where she had no choice but to quit because of the employer's actions. Id. In order to prove a constructive discharge, plaintiff "must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." Blake v. MJ Optical, Inc., 870 F.3d 820, 826 (8th Cir. 2017) (quoting Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 418 (8th Cir. 2010)). An employee claiming constructive discharge shoulders a substantial burden. Id.

Plaintiff submitted her formal complaint on August 2, 2016, and defendant Donovan received it on August 9, 2016. That same day, Donovan wrote to plaintiff to inform her that her "report of harassment [would] be investigated thoroughly and promptly." [Doc. # 32-9]. Plaintiff resigned ten days later.[10] The Eighth Circuit has "consistently recognized that an employee is not constructively discharged if she quits without giving [her] employer a reasonable chance to work out a problem." Blake, 870 F.3d at 826 (quoting Trierweiler v. Wells

_____

position. [Doc. # 32-6 at 5]. Arguably, this allegation could have provided the basis for a retaliation claim, but she did not choose to proceed on it in this action.

[9] The parties address constructive discharge in conjunction with plaintiff's hostile environment claim. It was not necessary to address this argument for that claim because plaintiff failed to establish that she was subjected to severe or pervasive gender-based harassment. In an abundance of caution, the Court considers whether plaintiff can establish constructive discharge for the purposes of her retaliation claim.

[10] Plaintiff argues that defendants had an adequate opportunity to investigate her complaint because her resignation was not effective until September 2, 2016. She cites no authority for the proposition that defendants had a duty to continue the investigation once she announced her intention to resign.

Fargo Bank, 639 F.3d 456, 460 (8th Cir. 2011)) (internal quotation omitted).  Plaintiff argues

that a constructive discharge occurs "[i]f an employee quits because she reasonably believes

there is no chance for fair treatment."[11]  [Doc. # 39 at 21] (citing Kimzey v. Wal-Mart Stores,

Inc., 107 F.3d 568, 574 (8th Cir. 1997).  However, "[p]art of an employee's obligation to be

reasonable . . . is an obligation not to assume the worst, and not to jump to conclusions too fast."

Blake, 870 F.3d at 826 (internal quotations and citation omitted).  Here, defendant Donovan

returned from vacation and promptly forwarded the matter to the City's human resources

attorney, Chris Hesse.  Mr. Hesse asked Chief Ihler to determine whether plaintiff would

withdraw her complaint if defendant Doerr removed his comments from her evaluation — the

remedy she had requested from him on August 2, 2016.  Plaintiff testified that she decided that

the query from Mr. Hesse meant that defendants would not conduct an investigation into her

allegations and that she was being pressured to drop her complaint.[12]  Pl. Dep. at 108.  She

acknowledges, however, that she did not ask defendants Donovan or Ihler about the status of her

complaint before she resigned.  Id. at 109-10.  Under these circumstances, plaintiff did not give

defendants a reasonable opportunity to respond to her complaint and therefore cannot establish

that she was constructively discharged.  Her retaliation claim thus fails as a matter of law.

### C.      Count IV — Conspiracy to Violate Civil Rights

In order to show a constitutional conspiracy, a party must show that two or more

individuals conspired for the purpose of depriving, either directly or indirectly, a person or

persons of their right to equal protection of the laws or of equal privileges and immunities under

---

[11] Plaintiff cites defendant Doerr's statement to her that the city's personnel manual and the police department's general orders did not apply to him, the city's lack of a clear procedure for conducting harassment investigations against the mayor, defendant Donovan's lack of investigative experience, and the general sense that defendant Doerr was not answerable to anyone.  See [Doc. # 39 at 21-22].

[12] Plaintiff's reaction to Mr. Hesse's inquiry is puzzling, because a communication from the employer's human relations counsel typically indicates that a discrimination complaint is being investigated.

the laws and that an act was done in furtherance of the conspiracy that caused an injury or deprivation to another. Marti v. City of Maplewood, Mo., 57 F.3d 680, 685 (8th Cir. 1995). To withstand summary judgment, plaintiff must "allege with particularity and specifically demonstrate with material facts" that the defendants reached an agreement. Bonenberger v. St. Louis Metro. Police Dep't, 810 F.3d 1103, 1109 (8th Cir. 2016) (quoting City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989)). Plaintiff can meet this burden by "pointing to at least some facts which would suggest [the defendants] reached an understanding to violate [her] rights." Id. (internal quotations and citations omitted).

Plaintiff alleges in her complaint that the defendants conspired to deny her equal protection under the law by failing to investigate her harassment claim, "threatening sanction for complaining," failing to shield her from discrimination, and then retaliating against her for complaining about defendant Doerr's behavior. Complaint at ¶ 64. Plaintiff relies on the following acts to support her conspiracy claim: (1) defendant Doerr's comments on her 2016 evaluation, (2) defendant Ihler's refusal to intervene with the mayor on her behalf, and (3) defendant Donovan's alleged failure to investigate plaintiff's complaint. [Doc. # 39 at 26].

These acts are not sufficient to support plaintiff's claim. With respect to the first act, there is no evidence that defendant Doerr consulted with the other defendants before including his comments on plaintiff's 2016 evaluation. With respect to defendant Ihler, plaintiff testified that he did not intervene on her behalf with the mayor because he "took the path of least resistance." She also testified that the "mayor does not like Chief Ihler and Chief Ihler does not like the mayor." Pl. Dep. at 70-71. While defendant Ihler disavowed having any ability to remove the comments, he did facilitate her request to meet with the mayor. Id. at 78-79. Granting plaintiff an inference that defendant Ihler would conspire with defendant Doerr despite

their mutual dislike, there is no evidence that defendant Ihler bore plaintiff any animus or wanted her to suffer any adverse consequences.  Indeed, he rated her performance as excellent in the 2016 evaluation and approved her for a merit raise.  With respect to the third act, defendant Donovan forwarded plaintiff's complaint to counsel Hesse for investigation, who offered to have the comments removed from her evaluation in exchange for her dropping the complaint. Plaintiff was under no obligation to accept the offer but her outright refusal without further discussion or negotiation does not amount to evidence that her complaint was not taken seriously.   Plaintiff has failed to present evidence that the defendants reached an agreement to violate plaintiff's rights.  Defendants are entitled to summary judgment on plaintiff's civil conspiracy claim in Count IV.[13]

### D.      Count V — *Monell* Liability

Plaintiff alleges that, although the defendant City of Bellefontaine Neighbors has policies and procedures that prohibit discrimination and require its employees to report discrimination, the City also has policies, practices, customs or patterns that violated plaintiff's constitutional and federal statutory rights.  Complaint at ¶ 71.  In particular, she claims that the City failed to properly train, supervise, control, or discipline the individual defendants.

In general, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" on a respondeat superior theory of liability.  Marsh v. Phelps Cty., No. 17-1260, 2018 WL 3863923, at *4 (8th Cir. Aug. 15, 2018) (citing Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  However,

---

[13] Defendants argue that they are entitled to qualified immunity, which shields government officials from liability in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have known.  Burnikel v. Fong, 886 F.3d 706, 709 (8th Cir. 2018) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Because the Court finds that plaintiff has not established the violation of her constitutional rights, it is unnecessary to address the parties' arguments on this issue.  See Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010)  (courts apply two-part test to qualified-immunity claim: (1) has plaintiff demonstrated a violation of a constitutional right and (2) was the constitutional right clearly established at the time of the violation); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (qualified immunity questions may be addressed in either order).

> [l]ocal governing bodies . . . can be sued directly under § 1983 for monetary,
> declaratory, or injunctive relief where . . . the action that is alleged to be
> unconstitutional implements or executes a policy statement, ordinance, regulation,
> or decision officially adopted and promulgated by that body's officers.  Moreover,
> . . . local governments . . . may be sued for constitutional deprivations visited
> pursuant to governmental "custom" even though such a custom has not received
> formal approval through the body's official decisionmaking channels.

Id. (quoting Monell, 436 U.S. at 690-91) (alterations in original).  Under this rubric, the courts

recognize "claims challenging an unconstitutional policy or custom, or those based on a theory

of inadequate training, which is an extension of the same."  Id.  A plaintiff seeking to hold a

municipality liable for the unconstitutional acts of its employees or officers must first establish

"a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."  Id. (quoting Schaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016).  The plaintiff

must point to "an official policy, a deliberate choice of a guiding principle or procedure made by

the municipal official who has final authority regarding such matters."  Id. (internal quotation

and citation omitted).  "Further, the plaintiff must prove that the policy was the 'moving force'

behind a constitutional violation."  Id. (citation omitted).

Defendants argue that plaintiff cannot establish liability under Monell because she has

failed to establish that she sustained a violation of her constitutional rights.  The Eighth Circuit

"has consistently recognized a general rule that, in order for municipal liability to attach,

individual liability first must be found on an underlying substantive claim."  Brockinton v. City

of Sherwood, Ark., 503 F.3d 667, 674 (8th Cir. 2007); see also Granda v. City of St. Louis, 472

F.3d 565, 568 (8th Cir. 2007) ("A claim brought against a municipality under § 1983 is

sustainable only if a constitutional violation has been committed pursuant to an official custom,

policy, practice or custom of the city.")  (emphasis added).  Plaintiff asserts that the City can be

held liable regardless of whether individuals committed a violation of her rights, citing Webb v.

City of Maplewood, 889 F.3d 483, 486 (8th Cir. 2018). The plaintiffs in Webb brought suit against the City of Maplewood claiming that their due-process and equal-protection rights were violated by its practice of issuing arrest warrants for those who failed to appear in court or pay fines on traffic violations. The city sought dismissal, arguing in part that the individuals responsible for the alleged violations were all entitled to absolute immunity and, therefore, the city itself could not be held liable. The Eighth Circuit rejected the municipality's argument. "[E]ven if . . . the City's . . . officials all enjoy personal immunity from suit, it hardly follows that they did not engage in any unlawful acts or that the City is thereby immune as well." In language relevant to plaintiff's argument here, the court stated that, "although 'there must be an unconstitutional act by a municipal employee' before a municipality can be held liable, there 'need not be a finding that a municipal employee is liable in his or her individual capacity.'" Id. at 487 (citations omitted). Thus, Webb does not stand for the principle that a municipality can be held liable under Monell even where there is no finding that a constitutional violation occurred. Because plaintiff has not demonstrated that her equal-protection rights were violated, there is no municipal liability under Monell. Assuming for the sake of argument that plaintiff's claim that she was improperly denied a take-home car establishes a violation of her equal protection rights, she has not provided any evidence that this denial was the result of a policy, custom, practice or pattern.

In conclusion, the Court finds that defendants are entitled to summary judgment with respect to all of plaintiff's claims with the exception of her claim that they denied her use of a take-home car based on her gender.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. # 30] is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that this matter is set for jury trial on **Monday, October 15, 2018,** at **9:00 a.m.**, in Courtroom 15 South.  The parties are reminded that their pretrial compliance is due on **September 24, 2018**.  The parties shall file any objections to the opposing side's pretrial designations by **October 1, 2018.**

**IT IS FURTHER ORDERED** that defendants' motion to strike plaintiff's  additional facts in dispute [Doc. # 42] is **denied as moot**.

_/s/ John M. Bodenhausen_   
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of September, 2018.